**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Marc Haas, Susan Haas, Rob Star, and Melissa Star,
Appellants,

v.

TI Oldfield Operations, LLC, SF Operations, LLC,
Oldfield Club, Oldfield Community Association,
Oldfield Club Board of Directors, and John Does 1-10,
Respondents,

And

TI Oldfield Operations, LLC and SF Operations, LLC,
Third Party Plaintiffs,

v.

Oldfield, LLC and Crescent Communities, LLC f/k/a
Crescent Resources, LLC, Third Party Defendants.

Appellate Case No. 2018-000707

———

Appeal From Beaufort County
Edgar W. Dickson, Circuit Court Judge

———

Unpublished Opinion No. 2021-UP-027
Submitted November 2, 2020 – Filed January 27, 2021

———

**AFFIRMED**

Denise Lynn Savage, of Savage Law, PLLC, of Beaufort, for Appellants.

Ian S. Ford and Hunter H. James, of Ford Wallace Thomson, LLC, of Charleston, for Respondents Oldfield Club and Oldfield Club Board of Directors.

Merritt Gordon Abney, of Nelson Mullins Riley & Scarborough, LLP, of Charleston, for Respondents TI Oldfield Operations, LLC and SF Operations, LLC.

Suzanne Elizabeth Deters and Robert Michael Ethridge, of Ethridge Law Group, LLC, of Mount Pleasant, for Respondent Oldfield Community Association.

---

**PER CURIAM:**  This is a dispute between four homeowners and several entities we will collectively call "Development."  The homeowners sued Development for breach of a settlement agreement, negligence/gross negligence, and constructive trust/accounting; all arising out of how money is allocated between Development's community association and its golf course.  We affirm.

## FACTS

Marc Haas, Susan Haas, Rob Star, and Melissa Star are property owners at Oldfield, a private community located in Bluffton.  Marc and Susan Haas are Melissa's parents.  For ease of reference, we refer to the group as "Homeowners."

All Oldfield property owners are automatically dues paying members of the Oldfield neighborhood homeowners' association and the Oldfield community club (also referred to as the social club).  Property owners who choose to become "golf club members" are also responsible for further financial obligations depending on their level of golf membership.

Homeowners brought this action in March 2016 asserting their social/community dues were being improperly used to fund the golf club's operations.  Homeowners believe there should be a financial "firewall" between Development's social/community finances and golf finances.  In other words, they maintain

Development may not apply any social/community money to golf maintenance and operations.

The catalyst for this case appears to have been a 2013 increase in everyone's social dues. Development also increased the level of access that community/social members had to the golf facilities. This prompted discussion among some residents that the golf club was losing money and that giving all Oldfield members increased access to the golf club was a pretext to justify sending more in social dues money to the golf club.

After roughly a year and a half of litigation, Development entities separately moved for summary judgment on all of Homeowners' claims. The circuit court granted summary judgment after conducting a hearing. This appeal followed.

## LAW/ANALYSIS

Homeowners raise a number of issues on appeal. We need not address all of them because the summary judgment finding will stand as long as a single ground supports it.

We believe three things control here: Development's governing documents, the 2009 settlement, and the statute of limitations. All issues share the common question of whether there is a genuine dispute of material fact that prevented the circuit court from granting summary judgment.

## GOVERNING DOCUMENTS

The relevant portion of Section 3.1 of Development's "Recreational Covenant" states that property owners, as Social Members, agree

> to pay to the Club Operator <u>assessments</u>, <u>annual dues</u>, and <u>minimum usage fees</u> in such amount as Club Operator shall specify from time to time, except that [Social] Members *shall not be subject to <u>assessment</u> for operating deficits or capital improvements related to golf facilities or golf operations*.
>
> The dues for [Social] Membership shall be based upon a budget of the estimated costs of maintaining, repairing, replacing, insuring, operating and providing the facilities, activities, and *events available for the use and enjoyment of [Social] Members*, and a reasonable share of the

> overhead expenses associated with general operation and administration of the Club.
>
> …Such budget shall not include costs associated *solely with facilities, activities, or events that do not benefit [Social] Members*. In determining the level of dues to be charged for [Social] Memberships, the total estimated costs pursuant to such budget shall be divided by the number of memberships of all classes and categories to whom the facilities, services and/or programs covered by such budget are made available.

(emphases added). The passage above is clear and unambiguous in explaining that social members are not responsible for paying golf "assessments." We do not read "assessments" to prevent dues increases, even dues increases with some relationship to golf facilities, provided the golf facilities have been made available for the use and enjoyment of social members.

Homeowners do not differentiate in their argument between dues and assessments, but the Recreational Covenant's first paragraph distinguishes between assessments, annual dues, and minimum usage fees. These categories are listed separately, and all social members are obligated to pay each of them. When the covenant subsequently protects the social members from golf course obligations, only the word "assessment" appears.

There is no definitional section in the Recreational Covenant, but traditional meaning and context suggest that Homeowners and other social members are not protected from a "dues" increase related to golf, as Homeowners assert, as long as golf is "available for the use and enjoyment of [social] members" via the ten complimentary rounds of golf per year allotted to each property owner. In addition to the annual complimentary golf rounds, social members are currently allowed to use and enjoy the golf club's restaurant, pro shop, and the administrative office, which services both social and golf members. Under Homeowners' proposed interpretation, social members would be entitled to enjoy the golf-related amenities without contributing to the maintenance, upkeep, or other cost of these amenities. This directly conflicts with the Recreational Covenant, as noted above.

To be fair, it does not seem as though social members make much use of the golf club, its restaurant, or the complimentary golf rounds. Still, the Recreational Covenant provides that frequency of use is irrelevant. The covenant states that "[n]o

[property owner] may exempt himself or herself from liability for Membership Fees by non-use of Club facilities. . . ."

**2009 SETTLEMENT**

Homeowners were once golf club members, but when Oldfield's former developer declared bankruptcy, Homeowners took legal action in Texas to get out of their golf club memberships. That produced a confidential "termination" or settlement agreement in September 2009. Homeowners believe Section 2 of that settlement mandates that they not be charged dues for any golf facilities.

In relevant part, the settlement provides:

> the terms and provisions of the Membership Agreement that relate to or are attributable to the Member's use, access, rights, duties, liabilities and obligations concerning the Golf Course attributable solely to being a member of the Club, including the Member's obligation to pay in full its Membership Contribution, shall automatically be terminated, cancelled, and extinguished and shall be of no further force and/or effect.

We read this as relieving Homeowners of any responsibility going forward to pay for the golf memberships they previously purchased. Homeowners thus reverted to being social members pursuant to Section 3.1 of the Recreational Covenant. The settlement does not contain any language creating a new separate class of membership for Homeowners or a budgetary firewall.

**STATUTE OF LIMITATIONS**

The legal claims in this case are for breach of contract (the 2009 settlement) and negligence. As the circuit court noted, the statute of limitations for negligence and breach of contract is three years.

This lawsuit began in March 2016; meaning the limitations period must not have started before March 2013. The circuit court granted summary judgment based on the evidence Rob Star met with Development representatives in 2012, expressed concern about how administrative costs were allocated, and admitted in his deposition that this lawsuit was about the same concerns. We agree.

One of the key dates, but not the earliest key date, is February 7, 2013. That is when Development sent an email to all property owners informing them of an increase in

the social dues.  That same email explained the previous allotment to social members of four rounds of golf at a price determined by the golf professional would be increased to ten complementary rounds.  Rob Star agreed during his deposition that he would have received the email when it was sent.

The second key date is March 5, 2013.  That is the date of an email from Rob Wilson, another Oldfield homeowner, to one of Development's representatives.  This message refers back to a 2012 meeting and discussion where Development apparently disclosed that there was not a financial "firewall" between the social/community finances and the golf club's finances.  Rob Star was at the same meeting.  He admitted this in his deposition, and he also admitted that his claims in this suit arise out of the same concerns raised in that meeting.

To be fair, Star would say he did not feel like he got straight answers to the questions he raised in 2012 and thereafter.  Still, the statute of limitations "runs from the date the injured party either knows or should have known by the exercise of reasonable diligence that a cause of action arises from the wrongful conduct." *Dean v. Ruscon Corp.*, 321 S.C. 360, 363, 468 S.E.2d 645, 647 (1996).  The law requires an injured party to "act with some promptness where facts and circumstances of the injury would put a person of common knowledge and experience on notice that some right of his had been invaded or that some claim against another party might exist," and the statute of limitations is not on hold until "advice of counsel is sought or full-blown theory of recovery is developed." *Johnston v. Bowen*, 313 S.C. 61, 64, 437 S.E.2d 45, 47 (1993) (internal citation omitted).  Having gone through the voluminous evidence, we find it is evident that Star (and others) long-suspected there was no firewall between the community association and the golf club, and that the community association was sharing in some of the administrative costs associated with golf facilities.

Homeowners also make a claim for accounting, which lies in equity not law. *See Historic Charleston Holdings, LLC v. Mallon*, 381 S.C. 417, 427, 673 S.E.2d 448, 453 (2009).  However, it appears Homeowners never discussed this claim either here or below when arguing the statute of limitations, thus, any argument regarding the accounting claim has been abandoned.

**REMAINING ISSUES**

The above analysis controls on all issues Homeowners raise save one:  Homeowners argue the circuit court erred in signing an order drafted by opposing counsel. Nothing prohibits a circuit court from the rather routine practice of accepting and signing proposed orders drafted by counsel.

**CONCLUSION**

Based on the foregoing, summary judgment is

**AFFIRMED.[1]**

**THOMAS, HILL, and HEWITT, JJ., concur.**

---

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.